### PERELMAN et al. v. WARNER BROS. PICTURES, Inc., et al.
### No. 8195.

District Court, E. D. Pennsylvania.

Jan. 31, 1935.

Otto Kraus, Jr., and Benjamin M. Golder, both of Philadelphia, for plaintiffs.

Morris Wolf (of Wolf, Block, Schorr & Solis-Cohen), of Philadelphia, Pa., for answering defendants.

WELSH, District Judge. ·

This case presents features so important to the legal, cultural, and the moral issues that are before our country to-day that a chancellor would not be doing his full duty if he failed in an opinion to treat the subject having in mind a full recognition of these facts. The court wants to take occasion to express to the learned counsel on both sides, and to the very estimable witnesses who appeared before him, his appreciation of their learning and willingness to impart information and suggestions.

The plaintiffs ask for an injunction against the defendants, alleging violation of the anti-trust laws of the United States. Plaintiffs allege, and defendants admit, that the contracts between the parties contain a prohibition against what is known as "Double Feature." This is an expression well known in the motion picture world. Both of the contending parties consider the question as vital. Plaintiffs claim that without the ability to present a "double feature" program they are unable to meet the serious competition that the defendants themselves have set up in the business, brought about by the introduction of the vaudeville and theatrical· features used by the defendants in large central areas in what are called "de luxe houses." Testimony was introduced tracing the history of the motion picture industry from its earliest inception to the present day. Both plaintiffs and defendants are in general agreement so far as this history

is concerned. There is no doubt in the mind of the chancellor that the present condition so far as the double feature program is concerned were actually brought about in the way that has been described.

The evidence shows that the double feature program has grown enormously throughout the United States and that in many areas the defendants themselves resort to it. The evidence also shows that for some years the defendants, who have been described as the major producers, have been trying in every possible way to restrict this practice. In practically every contract put out by the defendants in certain areas (including the area in this jurisdiction), the exhibitor is obliged to agree under certain reserved penalties that no double feature will be shown. Plaintiffs by evidence produced showed that by the control that the defendants have over the major production of pictures they (the plaintiffs) could not carry on their business as exhibitors without the pictures controlled by the defendants. This situation places the defendants in a peculiarly strategic position to dominate the whole situation. The chancellor was deeply impressed with the fact that by reason of the tremendous concentration of resources that are in the power and control of these defendants they are able to absolutely dictate their own terms and conditions upon which an exhibitor may do business with them. It is this serious situation that causes the chancellor to weigh fully every fact bearing on the important questions at issue. The motion picture industry, next to the church and school, touches our people most intimately. The industry has such possibilities for good or evil in our civilization of to-day that all of us who have to do with any phase of the industry should weigh carefully our motives and consider carefully the effect of our actions and judgments.

Reference has been made to the present domination of the industry by the defendants. It is not intended to be implied that the domination has been secured by unlawful means. Legitimate economic laws may have produced that condition. But the fact is inescapable that such a condition, however caused, does exist. Therefore, the action of the defendants, so far as the probable effect of the double feature prohibition in the contract is concerned, must be considered in the light of that truth. If the complainants were able to have a wide range of selection, and a freedom of choice unrestricted by economic conditions, the action of the de-

fendants complained of might not be so injurious upon the complainants and the public.

During the progress of the hearings objection was made by the defendants to the chancellor considering the public aspect of the question. Yet this subject could not be fairly and properly considered if the public viewpoint and the public interest were eliminated. The public is vitally interested in a free and uninterrupted flow of commerce and a free and uninterrupted right of contract. Congress has taken the means through approved legislation to secure both. Only by judicial recognition of the anti-trust legislation of Congress can the rights of the parties and the public be conserved. These rights are not only commercial, having their roots in the soil of trade, but they are cultural to a marked degree. The chancellor watched with close attention the unfolding of the facts in this case by the various witnesses. He could not but be impressed with a sense of uneasiness at the conditions as they were revealed. What impressed him most was the already almost complete domination of the industry by the defendants, and a realization that if this domination were to go unchecked, or be further extended, the opportunity for the expression of the cultural life of our great nation would be controlled completely by a small group who might or might not be representative of the aspirations and inspirations of our people. The chancellor was irresistibly forced to the conclusion that if the restraints of trade and commerce practiced by the defendants in their contracts now complained of were permitted to continue, the independent producer and the independent exhibitor would be greatly injured and interfered with, and the public welfare impaired. This is particularly true just at this time, when the economic conditions are such that if the independent producer and the independent exhibitor are permitted to be handicapped in the manner complained of they will not be able to survive, and if destroyed it might be a long time before the monopolistic control and domination could be challenged or broken.

Defendants contend that the double feature policy complained of lowers the efficiency of the industry, in that it tends to cheapen intrinsically and intellectually the product. Their motive, from their viewpoint, does not control when the evidence shows that the effect of their actions results in a violation of federal legislation on the subject.

Defendants further contend that there was no conspiracy on the part of the defendants to do the thing complained of. However, from all of the evidence produced showing the discussion of this matter, the purposes desired to be obtained by the defendants, the means of combating the double feature program, the unanimity of action, the chancellor has no hesitation in saying that this unanimity of action was not a coincidence, but, in his opinion, a well-defined, well thought out, well-studied intent to accomplish a purpose prohibited by the federal laws.

From the facts as testified to, the court makes the following findings of fact:

1. Plaintiff at the time of filing his bill of complaint and prior thereto was a copartner with Louis Perelman, which copartnership owned and operated two independent motion picture theaters within the city of Philadelphia.

2. The defendants Vitagraph, Inc., RKO Distributing Corporation, Paramount Pictures Distributing Corporation, Metro-Goldwyn-Mayer Distributing Corporation, Fox Films Corporation, and United Artists Corporation, are distributors of motion pictures produced and distributed in interstate commerce.

3. Defendants, in their contracts for the sale or leasing of feature pictures, have inserted clauses to the effect that the feature picture so sold or leased may not be exhibited in conjunction with any other feature picture on a double feature program.

4. The violation of said provision by an exhibitor party thereto constitutes a breach of such contract and gives the defendants the right to withhold the delivery of films contracted for, or to otherwise penalize the exhibitor by postponing the availability of pictures.

5. The exhibition of motion pictures is conducted by two classes of exhibitors, viz.: (a) Through theaters owned and/or controlled and/or operated by companies producing motion picture films or their subsidiary companies, such exhibition theaters being commonly known as "affiliated" theaters; and (b) through theaters operated by those having no connection with producing companies, such theaters being commonly known as "independent" theaters or "independent" exhibitors.

6. The affiliated theaters operate large and important theaters in the city of Philadelphia and vicinity and enjoy the privilege

of early exhibition of feature pictures distributed by the defendants. When said features are released to the plaintiff and other independent exhibitors, they have lost some of their commercial value. The plaintiff and other independent exhibitors have been able to secure greater box office returns by the exhibition of "double feature" programs than by the exhibition of single feature programs, and the effect of prohibiting the exhibition of "double feature" programs is to reduce their income.

7. Plaintiff and other independent exhibitors have exhibited two feature pictures on a single program as an additional attraction to their patrons to overcome the reduced attractiveness of feature pictures previously shown in theaters enjoying the early exhibition privileges.

8. Plaintiff and other independent exhibitors contract for pictures distributed by defendants under a system known as "block booking"; that is, the leasing of a number or group of pictures, the subjects, titles, or time of availability of which are not known when the contract is made.

9. The producers of motion pictures are divided into two classes; one commonly known as "major" producers, and the other commonly known as "independent" producers. All the defendants are either "major" producers or are the distributors of the motion pictures produced by the "major" producers. The defendants produce and distribute a great majority of all feature films and short subject films produced and exhibited in the United States.

10. The films distributed by the defendants and exhibited by the plaintiff and others in Philadelphia are received into Pennsylvania from other states and are the subject of interstate commerce.

11. The requirements of motion picture theaters differ with each locality and depend upon the preference of the patrons and the novelty of their attractions.

12. Plaintiff and other independent exhibitors require the feature films produced by the major producers in order to maintain their theaters, and they are required to sign the defendants' contracts in order to procure such features.

13. Plaintiff and other independent exhibitors cannot survive in business by exhibiting only feature films produced by the independent producers.

14. The clauses in defendants' contracts prohibiting the exhibition of their feature films as part of a double feature program have caused the plaintiff and other independent exhibitors to purchase fewer feature pictures for exhibition purposes than they would have purchased if they were permitted to use such features on double feature programs.

15. The said clauses have resulted in a reduction of the number of feature films produced, sold, or leased by independent major producers.

16. The exhibition of two feature films on a single program requires more pictures to be produced and sold, and the clauses prohibiting the use of films as part of double feature programs reduces the number of pictures required to be produced.

17. The clauses in defendants' contracts prohibiting the use of their features as part of a double feature program tends to reduce the business of the independent producer and to create a monopoly in the production and distribution of pictures in the major producers, the defendant distributors and their affiliated exhibitors.

18. The use of said clauses tends to restrict plaintiff and other independent exhibitors in their purchases of films from competitors of defendants, and thereby to lessen competition among distributors and their respective producers.

19. Defendants have by agreement determined to prohibit the use of feature films distributed by them in conjunction with any other feature films on a double feature program, and have persisted in such agreement.

20. Defendants have entered into a combination and conspiracy in restraint of trade amongst the several states and have carried out the purpose of said combination by inserting in their distribution contracts the respective clauses prohibiting the use of their feature films with other feature films on double feature programs.

21. Defendants have combined and conspired among themselves, and with others, to insert in their respective contracts the double feature clauses which tend to create a monopoly in the trade and commerce among the several states of distributing and exhibiting of motion pictures.

From the above facts as found the court makes the following:

## Conclusions of Law.

1. The defendants have entered into a combination and conspiracy in restraint of trade or commerce among the several states.

2. The combination or conspiracy of the defendants lessens competition and tends to create a monopoly in trade or commerce among the several states.

3. Defendants have violated the Sherman Anti-Trust Act (July 2, 1890, c. 647, § 1 [15 USCA § 1]) and the Clayton Act (October 15, 1914, c. 323, § 3, 38 Stat. 731 [15 US CA § 14]) by inserting in their contracts with plaintiff and other exhibitors provisions prohibiting the exhibition of feature films distributed by the defendants, in conjunction with other feature films on a double feature program.

4. Defendants have entered into contracts, and have combined and conspired to enter into contracts, with the plaintiff and other exhibitors for the leasing of feature motion picture films, on condition, agreement, and understanding that the plaintiff and said other exhibitors shall not use the motion pictures of others except as limited therein, the effect of which is to deter the plaintiff and others from using feature pictures of other producers and tends to create a monopoly in interstate commerce.

5. The provisions in defendants' contracts prohibiting the use of the feature films, distributed by them, on double feature programs, violate the Sherman Anti-Trust Act [15 USCA §§ 1–7, 15 note] and the Clayton Act [38 Stat. 730] and are illegal and void.

6. The court has jurisdiction of this cause under sections 16 and 12 of the Clayton Act [15 USCA §§ 26 and 22].

7. Plaintiff by reason of the combination and conspiracy between the defendants has been and is threatened with loss or damage and he has the right to maintain the present action.

8. Plaintiff is entitled to an injunction commanding defendants to cease and discontinue their agreement, combination, and conspiracy to prohibit the exhibition of the feature films distributed by defendants in conjunction with other feature films on double feature programs, and restraining defendants from making such prohibition a part of any contract with the plaintiff, and from penalizing plaintiff in any manner because of the exhibition of their feature films on double feature programs in conjunction with any other feature film.

A decree may be prepared by counsel in conformity with the findings and conclusions herein.